■ ALBERT BIALEK ASSOCIATES, INC., Respondent, v ARDEN-ESQUIRE REALTY COMPANY, Appellant.

In this action to recover a brokerage commission, plaintiff Albert Bialek Associates alleges that its principal, Albert Bialek, entered into an oral agreement on behalf of a client with the defendant's authorized representative, embracing the essential elements of a multiyear lease of defendant's storefront property at 689 Fifth Avenue. Defendant moved for summary judgment dismissing the complaint, alleging that the parties had not agreed on all the essential terms of the proposed lease prior to the termination of negotiations, and further alleging that its representative would not have been authorized to enter into such an agreement.

In a carefully reasoned opinion, Special Term denied the motion for summary judgment, concluding that there were factual issues presented as to whether the parties had in fact agreed to the essential terms of the proposed lease and also as to whether defendant's representative had authority to enter into such an agreement. Addressing specifically the issue which we deem dispositive, Special Term concluded that although there was no evidence that agreement had been reached on the terms of the commission to be paid plaintiff, a factual question was presented as to whether that was an essential term of the transaction.

We disagree with this latter aspect of Special Term's determination, and accordingly reverse the order appealed from and grant the motion of the defendant for summary judgment dismissing the complaint. From a careful review of the record it seems to us clear that agreement as to the commission to be paid was an essential term of the proposed lease, a view not indeed

disputed in plaintiff's able appellate brief, and that no such agreement was in fact reached prior to the termination of the negotiations between the parties.

During the relevant period of time the storefront in question was occupied by Gucci Shops, Inc., under a 15-year lease due to expire in December 1984. Plaintiff was authorized in March 1981 by defendant's general partner, Bernard Mendik, who was also president of the building's managing agent, to look for a successor tenant. It is undisputed that the terms of the plaintiff's compensation were not fixed at the outset of his employment, and were left to be negotiated along with the other terms of what was expected to be a multiyear lease.

Sometime before the events with which we are concerned, negotiations undertaken on behalf of the first proposed lessee introduced by plaintiff terminated unsuccessfully. In August 1982 plaintiff proposed Yves St. Tropez as the successor lessee. Negotiations relating to that proposed lessee were apparently terminated by Mendik in a letter dated October 29, 1982, in which Mendik referred to ongoing negotiations with Gucci, as to which he entertained little expectations of success, and stated his intention to spend some time seeking to find "a strong and well-known tenant." This letter crossed in the mail with a letter by plaintiff dated November 1, 1982, which submitted a formal offer on behalf of Yves St. Tropez, including a provision for a $500,000 letter of credit, obviously intended to reassure Mendik as to that company's financial ability. Apparently on the basis of the proposal set forth in the letter of November 1, negotiations were resumed.

In the offer of November 1, 1982, in addition to setting forth detailed proposals, including rent, which was to commence at $1,000,000 a year and increase thereafter, the following was said: "This offer is being submitted in accordance with (1) Rules for Commission to be received by Albert Bialek Associates, Inc., and (2) Commission Rates payable to Albert Bialek Associates, Inc., both enclosed."

At a meeting between Albert Bialek and Mendik's assistant, Suzy Reingold, it is undisputed that she specified several respects in which the November 1 offer was not acceptable, including such matters as the length of the proposed term, the cap on the consumer price index escalation clause, and the absence of a porter wage escalation clause. In addition, Ms. Reingold stated that the plaintiff's commission rate schedule and rules, which differed both in amounts to be paid and the treatment of certain contingencies from defendant's standard commission schedule and rules, were unacceptable.

In a letter dated November 10, 1982, plaintiff submitted a revised offer responsive in part to the objections previously communicated to it, but once again concluding with the statement: "This offer is being submitted in accordance with (1) Rules for Commission to be received by Albert Bialek Associates, Inc., and (2) Commission Rates payable to Albert Bialek Associates, Inc., both enclosed."

In the affidavit submitted by plaintiff's principal, Albert Bialek, he alleged that on November 12, 1982 Miss Reingold telephoned him "and told me that the revised offer was acceptable in all details if I would agree: (a) to accept the commission rate schedule which had been given to me by her on November 9 and (b) if I would agree to a pay out of the commission over a 10-year term in equal annual installments. I asked her if the above two matters regarding commissions were the only open matters in connection with the deal, and that if I agreed to her two requests regarding the payment of commissions we had a deal. She responded without equivocation, that we did. She further stated that she would be preparing the papers and that I would be hearing from her."

In Bialek's deposition he described the conversation following Miss Reingold's statement of position with regard to the brokerage commission and 10-year payout as follows:

"I asked her, 'Is that all that's preventing this deal from being made, and you would go forward in good faith to wrap up the deal'? She said 'Yes, I'll go along with it.'

"Q. What else was said, if anything?

"A. She said she would prepare the papers and I would be hearing from her."

On November 16, 1982 Reingold sent to plaintiff defendant's standard brokerage agreement for execution. In addition to providing for lower rates than plaintiff's schedule, it also provided that commissions were to be earned only upon the final consummation of the transaction, and that future payments would be conditioned on tenant's continued occupancy during the 10-year payout period. The proposal was rejected, plaintiff asserting that it did not conform to the November 12 telephone "agreement".

In a letter dated November 23, 1982 defendant stated that they were no longer in a position to discuss any lease with Yves St. Tropez. A renewal lease for the storefront in question was executed between the defendant and Gucci on January 3, 1983.

Except with regard to the failure to agree on brokerage commissions, we agree that the evidence submitted by plaintiff

was sufficient to raise factual issues as to whether or not the parties had agreed on the essential terms of the proposed lease, notwithstanding the defendant's sharply contradictory evidence and the doubtful aspect of the claim that Ms. Reingold was authorized to commit the defendant to a brokerage commission of over $400,000 on the basis of an oral agreement with regard to a proposed multiyear lease that, in the normal course of such events, might never be consummated in a form legally binding on the landlord and lessee. However, we think it clear that agreement on the brokerage commission was an essential element of the transaction, a position not indeed controverted in plaintiff's appellate brief, and that the record does not disclose such an agreement.

That agreement with regard to brokerage commissions was essential is apparent from the fact that such commissions were to be based upon a percentage of the rentals to be derived during the course of the multiyear lease, rentals, commencing at $1,000,000 per year and going up, and was accordingly an integral part of the proposed bargain. Any doubt as to its essential character is surely dispelled by the circumstance that in plaintiff's own formal offers it was expressly stated that the offers were being submitted in accordance with plaintiff's rules for commission and commission rates, the second such stipulation occurring after plaintiff was on notice that defendant would not accept plaintiff's rules or commission rates.

We think it equally apparent that plaintiff never agreed to accept defendant's commission schedule. The very best that can be inferred from plaintiff's affidavit and deposition is that he neither accepted nor rejected defendant's commission proposals, and chose to wait until he could review the formal written proposal. Upon receiving defendant's standard brokerage agreement for execution, the record is clear that plaintiff unequivocally rejected it.

In light of this determination it is unnecessary to consider whether the statements made by Ms. Reingold in the telephone conversation of November 12, accepting plaintiff's version of those statements, can reasonably be construed as a waiver of other provisions of defendant's standard brokerage agreement, one aspect of which protects the defendant against the obligation to pay brokerage commissions with regard to transactions that are not consummated, a protection that would appear to have been of particularly compelling importance with regard to a multiyear lease with annual rental payments starting at $1,000,000.

We observe further that nothing in the arrangements between the plaintiff and defendant precluded the plaintiff from pursu-

ing negotiations with other proposed lessees, including negotiations for a renewal of the Gucci lease, nor does it appear that plaintiff seriously contends otherwise.

Agreement not having been reached on all the essential terms of the proposed lease, it follows that plaintiff did not earn the commission sued for, and that defendant's motion for summary judgment dismissing the complaint should have been granted. (*Sibbald v Bethlehem Iron Co.*, 83 NY 378; *Kaelin v Warner*, 27 NY2d 352.) Concur — Sandler, J. P., Sullivan, Milonas and Kassal, JJ.